# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **PAUL B. MCGHEE,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:09cv00068 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

## I. Background and Standard of Review

Plaintiff, Paul B. McGhee, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq.* (West 2003 & Supp. 2009). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more

than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that McGhee protectively filed his applications for DIB and SSI on January 8, 2007, alleging disability as of December 12, 2006, due to back problems, leg problems, kidney and liver problems, a nervous condition, including panic attacks, and depression.[1] (Record, ("R."), at 122-24, 143, 177, 194.) The claims were denied initially and on reconsideration. (R. at 86-88, 92, 93-97.) McGhee then requested a hearing before an administrative law judge, ("ALJ"), which was held on September 18, 2008, and at which he was represented by counsel. (R. at 34-80.)

By decision dated October 10, 2008, the ALJ denied McGhee's claims. (R. at 19-33.) The ALJ found that McGhee met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2010. (R. at 21.) The ALJ also found that McGhee had not engaged in substantial gainful activity since December 12, 2006, the alleged onset date. (R. at 21.) The ALJ determined that the medical evidence established that McGhee suffered from severe impairments, namely degenerative disc disease, obesity, depression, anxiety, history of polysubstance abuse/dependence and a history of methicillin resistant staph aureus, ("MRSA"), but he found that McGhee did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 21-30.) The ALJ

---

[1]McGhee's DIB application is not contained within the record on appeal.

found that McGhee had the residual functional capacity to perform light work[2] limited by an occasional ability to balance, to stoop, to kneel, to crouch, to crawl and to climb ramps and stairs, an inability to withstand concentrated exposure to dangerous moving machinery, unprotected heights and vibrating surfaces, an inability to climb ladders, ropes or scaffolds and a need to perform work requiring only simple one- and two-step tasks requiring little independent decisionmaking. (R. at 30.) The ALJ found that McGhee could not perform any of his past relevant work. (R. at 31.) Based on McGhee's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ also found that other jobs existed in significant numbers in the national economy that McGhee could perform, including jobs as a cleaner, a maid/laundry worker, an office clerk, a document preparer and a telephone clerk. (R. at 32-33.) Thus, the ALJ found that McGhee was not under a disability as defined under the Act and was not eligible for benefits. (R. at 33.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2009).

After the ALJ issued his decision, McGhee pursued his administrative appeals, (R. at 13), but the Appeals Council denied his request for review. (R. at 1-5.) McGhee then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2009). The case is before this court on McGhee's motion for summary judgment filed March 15, 2010, and the Commissioner's motion for summary judgment filed April 12, 2010.

---

[2]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, he also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2009).

*II. Facts*

McGhee was born in 1969, (R. at 38), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He has a high school education and certification in welding. (R. at 39, 41.) McGhee has past relevant work experience as a welder, a press break and sheer operator, a lumber stacker, a salt bagger and an assembly line worker. (R. at 39-41, 167.) Bonnie Martindale, a vocational expert, was present and testified at McGhee's hearing. (R. at 67-79.) Martindale classified McGhee's past work as a fabricator, a welder and a sheet rock installer as medium[3] and skilled, as a lumber stacker as heavy[4] and unskilled, as a salt bagger as medium and unskilled, as an auto assembly line worker as heavy and unskilled and as a press brake operator as medium and semiskilled. (R. at 71-72.) Martindale was asked to consider a hypothetical individual of the same age, education and work history as McGhee, who could perform light work with an occasional ability to climb ramps and stairs, but who could never climb ladders, ropes or scaffolds, who could occasionally balance, stoop, kneel, crouch and crawl, who should avoid concentrated exposure to hazards such as dangerous machinery and unprotected heights, who could understand, remember and carry out simple, unskilled job instructions, who could maintain regular attendance and be punctual, who would not require special supervision to sustain a work routine, who could complete a normal workweek without exacerbation of

---

[3]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can do medium work, he also can do light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2009).

[4]Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds. If someone can perform heavy work, he also can perform medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2009).

psychological symptoms, who could function in production-oriented jobs requiring little independent decisionmaking and who could concentrate, interact with others and adapt to changes in the workplace. (R. at 72-73.) Martindale testified that, although such an individual could not perform any of McGhee's past work, he could perform other jobs existing in significant numbers in the national economy, including those of a cleaner, a laundry worker and an office clerk. (R. at 73-75.) Martindale next was asked to consider the same individual, but who was limited to the performance of sedentary[5] work. (R. at 75.) Martindale testified that such an individual could perform jobs existing in significant numbers in the national economy, including those of a document preparer, an information clerk, a telephone clerk, an order clerk, an assembler, a hand packer and an inspector. (R. at 75-76.) Martindale testified that an individual with poor or no ability to deal with the public, to deal with work stresses and to maintain attention and concentration could not perform any work. (R. at 77.) Martindale testified that an individual with a fair ability to follow work rules, to relate to co-workers, to use judgment, to interact with supervisors, to function independently, to understand, remember and carry out simple job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability also could not perform any work. (R. at 77-78.) Martindale next was asked to consider, aside from the previous mental limitations, an individual who could sit for a total of only one hour and stand for a total of only 30 minutes. (R. at 78.) She testified that such an individual could perform no work. (R. at 78-79.)

---

[5]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying items like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing often is necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2009).

In rendering his decision, the ALJ reviewed records from Billie J. Hunt, a licensed clinical social worker; University of Virginia Health Systems; Dr. Rodolfo B. Ceballos, M.D.; Wellmont Bristol Regional Medical Center; Saltville Medical Center; Johnston Memorial Hospital; Southwestern Virginia Mental Health Institute; Smyth Counseling Center; Family Physicians of Marion; Neuro Spine Solutions; Dr. Donald Williams, M.D., a state agency physician; Eugene Hamilton, Ph.D., a state agency psychologist; Dr. Jason P. Sheehan, M.D., a neurosurgeon; Dr. Michael Hartman, M.D., a state agency physician; Julie Jennings, Ph.D., a state agency psychologist; Garzon Clinic; Smyth County Community Hospital; Dr. David G. Parker, D.O.; Southwest Podiatry, P.C.; Dr. Juan F. Rodriguez, M.D.; Dr. G. David Dyer, M.D.; and Meghan Sullivan, F.N.P. McGhee's counsel submitted additional medical evidence from Dr. Parker; Smyth County Community Hospital; Family Physicians of Marion; Dr. Anthony E. Holt, M.D., a neurosurgeon; Saltville Medical Center; and Hunt to the Appeals Council.[6]

McGhee underwent low back surgery in 1999. (R. at 279, 298-99.) He reinjured his back in November 2006. (R. at 299.) He described his pain as low back pain radiating into the left leg. (R. at 299.) Physical examination on November 21, 2006, at Johnston Memorial Hospital, ("JMH"), revealed pain with range of motion, tenderness to palpation and paravertebral pain with muscle spasm. (R. at 300.) An

---

[6]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 1-5), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

x-ray of the lumbar spine was normal. (R. at 301.) McGhee was diagnosed with acute lumbar strain, was prescribed Lortab and was excused from work through November 24, 2006. (R. at 300, 303.)

Thereafter, McGhee reported multiple times to the emergency department at JMH and Wellmont Bristol Regional Medical Center, ("BRMC"), with complaints of back pain with radiation into one or both legs. On December 14, 2006, McGhee presented to the emergency department at BRMC with complaints of neck pain, low back pain, left elbow, left knee and left ankle pain after falling through a hole in a floor. (R. at 267, 279.) He exhibited vertebral point tenderness, muscle spasm/decreased range of motion and pain on neck movement. (R. at 279.) X-rays of the left elbow, left hip, left knee, left ankle, cervical spine and lumbar spine all were negative. (R. at 260-62.) McGhee was diagnosed with a contusion to the left elbow, left hip, left knee, left leg and left ankle, a lumbar strain and a neck strain. (R. at 253.) He received an injection of Toradol, Dilaudid and Phenergan, and was prescribed Lortab, Naprosyn and Norflex. (R. at 253-54.)

McGhee returned to BRMC two days later with continued complaints of low back, neck and left knee pain and numbness. (R. at 265-69.) He exhibited pain with back range of motion. (R. at 267.) He was able to move all extremities, had an unsteady gait, but exhibited normal motor functioning and sensation. (R. at 265-67.) McGhee was diagnosed with back pain and received a Toradol injection. (R. at 266-67.) An MRI of the lumbar spine, taken on December 15, 2006, showed a broad-based disc bulge at the L4-L5 level of the spine with potential mass effect on the origins of the L5 nerve roots bilaterally, complicated by facet and ligamentum flavum

hypertrophy at that level. (R. at 270-71, 473.) McGhee returned to BRMC on December 25, 2006, with continued complaints of severe back pain. (R. at 273-74.) Straight leg raise testing was negative bilaterally, and he exhibited no apparent motor or sensory deficit. (R. at 274.) McGhee had nontender, full range of motion of the extremities. (R. at 274.) McGhee was diagnosed with acute low back pain and received a Decadron and Toradol injection. (R. at 274.)

On January 3, 2007, McGhee was seen at Saltville Medical Center with complaints of "nerves" and a ruptured disc in his back. (R. at 382-83, 507.) He noted that he had been going to a Methadone clinic for the previous five months for pain management. (R. at 383, 507.) Straight leg raise testing was positive on the right, and he was diagnosed with back pain. (R. at 382.) On January 10, 2007, McGhee reported continued anxiety and noted that previous medications had not helped him. (R. at 506.) He was diagnosed with back pain with abnormal MRI and anxiety. (R. at 506.) On January 11, 2007, McGhee received a financial packet for the University of Virginia and a work excuse through February 1, 2007.[7] (R. at 383, 507.)

On January 14, 2007, McGhee was admitted to Southwestern Virginia Mental Health Institute, ("SVMHI"), on a temporary detention order. (R. at 349-67.) It was noted that McGhee was in long-term detoxification for opiates on Methadone, but had recently stopped Methadone treatment because he could not afford it since losing his job in December 2006. (R. at 353, 361.) He stated that he was depressed and had questionable thoughts of hurting himself. (R. at 353.) He also stated that his nerves

_____

[7]The court notes that McGhee already had been laid off from his job at this time. However, the treatment note states that the excuse was being provided "although not working now - for social services." (R. at 383.)

were shot.  (R. at 353.)  He denied then-current use of alcohol or street drugs.  (R. at 354.)  On admission, McGhee was diagnosed with a history of opiate addiction and a then-current Global Assessment of Functioning, ("GAF"), score of 65.[8]  (R. at 356.)  McGhee denied having an alcohol problem, but he indicated an opiate problem.  (R. at 362.)  On prescreening at Smyth County Community Hospital, he admitted to suicidal ideation and plan.  (R. at 362.)  However, he denied a suicidal history upon admission at SVMHI.  (R. at 362.)  On admission, McGhee's mood was euthymic with an appropriate affect, he was fully oriented, and his memory, insight and judgment were fair.  (R. at 363-64.)  Dr. Kambiz Birashk, M.D., diagnosed opiate dependence, the need to rule out ethanol abuse versus dependence and adjustment disorder with depressed mood.  (R. at 364.)  Dr. Birashk placed McGhee's then-current GAF score at 30.[9]  (R. at 364.)  McGhee was placed on Clonidine to taper from the Methadone, and Seroquel, Neurontin and Zoloft were initiated. (R. at 364.) He was discharged from SVMHI on January 19, 2007, with final diagnoses of opiate dependence, ethanol abuse, adjustment disorder with depressed mood and a GAF score of 60.[10]  (R. at 349, 360.)  McGhee's mother agreed to pay for continued Methadone treatment, and he was referred for continued outpatient mental health counseling. (R. at 349.)

_____

[8]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).  A GAF score of 61 to 70 indicates "[s]ome mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV at 32.

[9]A GAF score of 21 to 30 indicates that the individual's "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment . . . OR inability to function in almost all areas. . . ."  DSM-IV at 32.

[10]A GAF score of 51 to 60 indicates "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning. . . ."  DSM-IV at 32.

McGhee returned to Saltville Medical Center on January 23, 2007, seeking Methadone treatment. (R. at 505.) Without examining him, Dr. Powers[11] diagnosed opiate addiction, and he informed McGhee that he could not assume his care. (R. at 505.) McGhee presented to JMH the same day with complaints of continued severe low back pain radiating into the left leg. (R. at 288-92.) He stated that he was taking only over-the-counter pain medications. (R. at 288.) McGhee was in moderate distress, exhibiting pain on range of motion of the back with tenderness to touch in the lumbosacral area. (R. at 290.) Straight leg raise testing was positive bilaterally at 45 degrees, but McGhee had no apparent motor or sensory deficit. (R. at 290.) He was diagnosed with lumbar disc disease and was given an injection of Demerol. (R. at 288, 290.) He was prescribed Flexeril and Lortab. (R. at 290-92.) McGhee returned to JMH on February 1, 2007, with complaints of lower back pain. (R. at 283-87, 415, 432-33, 641-43.) Despite taking Advil and Tylenol at home, he rated his pain as a 10. (R. at 283, 415, 641.) Physical examination revealed normal reflexes. (R. at 285, 432, 643.) McGhee was diagnosed with acute chronic back pain and was prescribed Skelaxin and ibuprofen. (R. at 285-87, 432, 643.) He returned to JMH two days later with continued complaints of chronic back pain radiating into both legs with tingling and numbness. (R. at 428-31, 638-40.) Physical examination revealed positive straight leg raise testing bilaterally at 45 degrees, but McGhee had no apparent motor or sensory deficit and normal reflexes. (R. at 430.) He was diagnosed with acute chronic low back pain, rule out herniated nucleus pulposus. (R. at 421, 430.) McGhee was prescribed Lortab. (R. at 421.)

---

[11]Dr. Powers's full name is not contained in the record.

On February 13, 2007, McGhee informed Dr. Marilou V. Inocalla, M.D., with Smyth Mental Health Clinic, that his main problems were his nerves and chronic pain. (R. at 369-71.)  He denied depression, but reported that his nervousness began when his wife took his children away 14 months previously. (R. at 369.) McGhee stated that he stayed nervous constantly and was jittery, anxious and nervous around people. (R. at 369.) He reported sleeping "all the time" on his medications and that Zoloft made his head "too weird" and "more nervous." (R. at 369.) On mental status examination, McGhee was obviously anxious, but denied depression and suicidal or homicidal ideations. (R. at 370.) Dr. Inocalla noted that McGhee's main goal was to get medication for his nerves and his pain. (R. at 370.) She diagnosed opiate dependence, adjustment disorder with anxious mood and history of alcohol abuse, and she assessed his then-current GAF score at 60. (R. at 370-71.) Dr. Inocalla discontinued Seroquel, Neurontin and Zoloft, and she prescribed Buspar for anxiety, but recommended that McGhee return to his primary care physician to address pain issues.  (R. at 370-71.)

McGhee returned to JMH on March 8, 2007, with complaints of low back pain radiating into the legs. (R. at 424-27, 634-36.) Physical examination revealed tenderness to palpation, but McGhee had no apparent motor or sensory deficit, and his reflexes were normal. (R. at 426.) An x-ray of the left leg from February 16, 2007, was normal. (R. at 373.)  McGhee was diagnosed with chronic low back pain and was administered intravenous Morphine. (R. at 424, 427, 636.)

On April 9, 2007, Dr. Donald R. Williams, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment of McGhee, finding that he could perform light work with an occasional ability to perform postural

activities. (R. at 385-90.) Dr. Williams further found that McGhee should avoid concentrated exposure to hazards, such as machinery and heights. (R. at 388.)

On April 16, 2007, Eugenie Hamilton, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding that McGhee suffered from an adjustment disorder with depressed mood and opiate dependence and alcohol abuse, but that a residual functional capacity assessment was necessary. (R. at 391-403.) Hamilton opined that McGhee was moderately restricted in his activities of daily living, experienced moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and had experienced one or two episodes of decompensation, each of extended duration. (R. at 401.) The same day, Hamilton also completed a Mental Residual Functional Capacity Assessment of McGhee, finding that he was moderately limited in his ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to interact appropriately with the general public and to respond appropriately to changes in the work setting. (R. at 404-06.) In all other areas of work-related mental abilities, McGhee was deemed not significantly limited. (R. at 404-05.)

McGhee saw Dr. Jason P. Sheehan, M.D., a neurosurgeon at University of Virginia Health Systems, on April 11, 2007. (R. at 410, 467-68, 653.) Physical examination showed 5/5 strength in the right side and left upper extremity and 4+ strength in the left lower extremity. (R. at 410, 467, 653.) McGhee had normal muscle bulk and tone, and his neurological affect was normal. (R. at 410, 467, 653.) Casual gait was within normal limits. (R. at 410, 467, 653.) On April 27, 2007, after reviewing McGhee's December 2006 MRI, Dr. Sheehan opined that the benefits of

additional spinal surgery did not outweigh the risks, and he recommended an aggressive and comprehensive pain management approach. (R. at 407, 409, 651-52.)

On April 28, 2007, McGhee saw Dr. Donna Sanders, D.O., at Southwest Virginia Community Health Systems, Inc., with complaints of severe back pain radiating into his left leg. (R. at 502-04.) He had full muscle strength in the upper and lower extremities, and his gait was within normal limits. (R. at 502.) No abnormalities or somatic dysfunction were detected, no focal neurological deficits were appreciated, and reflexes were 2+ in all extremities. (R. at 502.) Dr. Sanders diagnosed low back pain, for which McGhee received a Toradol injection and a prescription for Tylenol #3, Ultram and ibuprofen. (R. at 502.) Dr. Sanders stated that because she was unsure whether McGhee was drug seeking, she gave him only three Tylenol #3. (R. at 502.) Later that day, McGhee called Dr. Sanders, stating that despite taking the prescribed medications, he still had uncontrollable pain. (R. at 503.) Dr. Sanders stated that McGhee was "begging for us to call in additional narcotic meds." (R. at 503.) She declined, and she advised him to report to the emergency department for further evaluation to ensure that no additional pathology was present that required urgent medical attention. (R. at 503.) On April 30, 2007, physical examination showed normal upper and lower extremities and a normal neurological examination. (R. at 437.) McGhee was diagnosed with degenerative disc disease and was prescribed Methadone. (R. at 437.) On May 29, 2007, McGhee requested pain medication due to back pain. (R. at 436.) He again was diagnosed with degenerative disc disease and was prescribed Methadone. (R. at 436.)

McGhee returned to JMH on June 20, 2007, with complaints of bilateral leg

swelling with foot pain. (R. at 416-20, 422, 621-25.) He was given intravenous Morphine. (R. at 416, 624-25.) Physical examination showed intact sensation and motor skills. (R. at 418, 623.) McGhee was diagnosed with acute bilateral pedal edema and foot pain, and he was prescribed Lasix. (R. at 418, 422, 623.) On June 25, 2007, McGhee again was seen for bilateral leg swelling and back pain. (R. at 435.) His Methadone prescription was refilled. (R. at 435.)

On July 26, 2007, Dr. Michael Hartman, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment on McGhee, finding that he could perform light work with an occasional ability to perform postural activities and a need to avoid concentrated exposure to hazards, such as machinery and heights. (R. at 439-45.)

The following day, Julie Jennings, Ph.D., a state agency psychologist, completed a PRTF, finding that McGhee suffered from an adjustment disorder with depressed mood and opiate dependence and ethanol abuse. (R. at 446-59.) Jennings opined that McGhee was moderately restricted in his activities of daily living, experienced moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and had experienced one or two episodes of decompensation, each of extended duration. (R. at 456.) The same day, Jennings completed a mental assessment, concluding that McGhee was moderately limited in his ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to interact appropriately with the general public and to respond appropriately to changes in the work setting. (R. at 460-62.) In all other areas of work-related mental functioning, McGhee was deemed not

significantly limited. (R. at 460-61.) Jennings concluded that McGhee should be able to understand and remember simple one- and two-step instructions, that his basic memory processes were intact, that he could maintain regular attendance and be punctual, that he would not require special supervision in order to sustain a work routine, that he could complete a normal workweek without exacerbation of psychological symptoms, that his activities of daily living and his social skills were functional and that he could function in production-oriented jobs requiring little independent decisionmaking. (R. at 462.) Jennings also found that McGhee would be capable of understanding and remembering instructions, concentrating, interacting with others and adapting to changes in the workplace. (R. at 462.) She concluded that he would be able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairment. (R. at 462.)

On August 14, 2007, McGhee saw Steven Chapman, a family nurse practitioner at Southwest Virginia Community Health Systems, with complaints of back pain, bilateral hip pain down both legs and tingling of the feet after falling the previous day. (R. at 496-97.) Physical examination was unremarkable. (R. at 496.) McGhee was diagnosed with back pain and was prescribed a Dexpak Taperpak. (R. at 497.)

McGhee began seeing Billie Hunt, a licensed clinical social worker at Southwest Virginia Community Health Systems, on August 21, 2007. (R. at 494.) McGhee was friendly and cooperative with a neat and appropriate appearance. (R. at 494.) His motor behavior was increased, his speech was pressured, and his mood was hopeful, anxious and depressed with an appropriate affect. (R. at 494.) McGhee's sensorium was impaired, he was paranoid, and his judgment and insight were poor.

(R. at 494.) He reported difficulty focusing and concentrating for the previous two years, and he also stated that he had become forgetful. (R. at 494.) McGhee reported isolating in his home and not wanting to be around others. (R. at 494.) He denied suicidal or homicidal ideations or hallucinations. (R. at 494.) Hunt diagnosed severe, recurrent, major depression without psychotic features. (R. at 494.) McGhee returned to see Hunt on August 28, 2007. (R. at 493.) Based on a mood questionnaire completed by McGhee, Hunt determined that he would benefit from further evaluation to rule out bipolar disorder. (R. at 493.) On September 18, 2007, McGhee reported that his symptoms of depression remained the same, including difficulty sleeping and concentrating, as well as racing thoughts. (R. at 492, 695.) Again, he was diagnosed with severe, recurrent, major depression without psychotic behavior. (R. at 492, 695.)

McGhee returned to JMH on October 4, 2007, with complaints of severe back pain with radiation into the legs. (R. at 610-14.) He noted a recent "near fall" injury that had worsened his back pain. (R. at 611.) Physical examination showed tenderness to the left gluteal region. (R. at 612.) McGhee was diagnosed with acute myofascial strain of the sacral region with no evidence of cord symptoms and was prescribed Vicodin, Motrin and Flexeril. (R. at 612.) McGhee returned to JMH on October 7, 2007, with the same complaints. (R. at 606-09.) He had positive straight leg raise testing at 45 degrees on the right and 30 degrees on the left. (R. at 607.) McGhee was diagnosed with chronic low back pain, which was treated with Elavil, Decadron and Percocet. (R. at 607-08.)

On October 23, 2007, McGhee saw Martha Larmer, a family nurse practitioner at Southwest Virginia Community Health Systems, for a follow-up on anxiety and

depression. (R. at 489-90, 685-86.) He reported not liking to be around others and difficulty sleeping. (R. at 489, 685.) Larmer diagnosed major depressive disorder, not otherwise specified, and anxiety disorder, not otherwise specified, and she prescribed Celexa. (R. at 490, 685.) The same day, when McGhee saw Hunt for counseling, he stated that he was not sure whether he would take the Celexa for fear of becoming suicidal. (R. at 491, 693.) His diagnosis remained unchanged. (R. at 491, 693.)

On October 12, 2007, McGhee complained of pain in the left lower leg and left buttock area after misstepping off of a sidewalk a week and a half previously. (R. at 563.) He was diagnosed with degenerative disc disease, his prescription for Methadone was refilled, and Dr. Parker administered an injection of DepoMedrol. (R. at 563.) On October 22, 2007, McGhee continued to complain of pain in the left buttock. (R. at 562.) He was diagnosed with lumbosacral dysfunction and sciatica, and Dr. Parker prescribed ibuprofen, ordered an MRI and referred him to pain management. (R. at 562.) An x-ray of the lumbar spine taken on October 29, 2007, showed no acute lumbar abnormality or significant interval change compared with an MRI study from April 12, 2005. (R. at 561.) An MRI taken the same day showed desiccative signal change and a moderate ventral extradural defect at the L4-L5 level of the spine, as well as a broad-based predominantly left paramedian to left foraminal disc herniation with moderate canal stenosis and ligamentum flavum hypertrophy and bilateral foraminal narrowing. (R. at 560.) This MRI also revealed a possible left laminotomy defect at the L4-L5 level. (R. at 560.) There was mild median to bilateral paramedian disc protrusion at the L5-S1 level associated with a posterior annular tear which had some enhancement, but no significant canal stenosis was appreciated. (R. at 560.) At most, there was some mild foraminal narrowing at the L5-S1 level. (R. at

560.) The appearance at the L5-S1 level was about the same as previous readings. (R. at 560.) There was desiccative signal change. (R. at 560.) A small Schmorl's node[12] was detected at the upper endplate of the L5 vertebra. (R. at 560.) McGhee was referred to pain management, and his dosage of Methadone was increased. (R. at 560.)

On November 5, 2007, McGhee was diagnosed with L4-L5 stenosis, peripheral neuropathy and degenerative disc disease. (R. at 556.) He was given information regarding the neurosurgery department at the University of Virginia. (R. at 556.) On November 15, 2007, when Dr. Sheehan reviewed the MRI of McGhee's lumbar spine taken on October 29, 2007, he opined that McGhee's back pain would not change substantially with another back surgery, and he recommended continued aggressive pain management. (R. at 245-47, 465, 648, 650.) On November 26, 2007, when McGhee saw Hunt for counseling, he reported depression about his situation, which included living with a friend rent-free during the week and staying with his parents on the weekends. (R. at 488, 692.) Hunt again diagnosed severe, recurrent, major depression without psychotic behavior. (R. at 488, 691.) McGhee again saw Hunt for counseling on December 11, 2007, with complaints of difficulty sleeping and stress over his declining health and financial situation. (R. at 485, 689-90.) McGhee was again diagnosed with severe, recurrent, major depression. (R. at 485, 689.)

On January 2, 2008, McGhee continued to complain of low back pain with radiation into the left leg. (R. at 553.) Dr. Parker diagnosed spinal stenosis at the L4-

[12]A Schmorl's node is an irregular or hemispheric bone defect in the upper or lower margin of the body of the vertebra. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 1143 (27th ed. 1988).

L5 level, chronic intractable pain and peripheral neuropathy, and he refilled McGhee's Methadone prescription and prescribed Neurontin. (R. at 553.) On January 17, 2008, McGhee saw Dr. Paul D. Williams, M.D., at Southwest Virginia Community Health Systems. (R. at 483-84, 681-82.) At that time, he denied depression, but stated that he had a "condition that is made better by Klonopin." (R. at 483, 681.) He stated that a different physician had prescribed him Klonopin and had informed him eight months previously that he was closing his office and that McGhee would need to find someone else to prescribe it. (R. at 483, 681.) Dr. Williams diagnosed severe, recurrent, major depression without psychotic features. (R. at 484, 682.) Dr. Williams wrote McGhee a 30-day supply of Klonopin, but informed him that he needed to find another primary care physician. (R. at 484, 682.)

McGhee returned to JMH on January 20, 2008, with complaints of left, low back pain radiating into the left gluteus maximus region for the previous three days. (R. at 601-05.) He had a full range of motion of the extremities and painful range of motion of the back, and muscle spasm was appreciated in the left low back region. (R. at 601-02.) McGhee was diagnosed with back pain, and he was prescribed Flexeril, Motrin, Ultram and Vicodin. (R. at 602.) On January 30, 2008, McGhee complained of swelling in both ankles. (R. at 550.) Dr. Parker diagnosed chronic intractable pain, and he refilled McGhee's Methadone and Neurontin. (R. at 550.) On February 28, 2008, McGhee complained of difficulty sleeping. (R. at 549.) Dr. Parker again diagnosed chronic intractable pain and insomnia/fatigue, and he refilled McGhee's Methadone. (R. at 549.) He noted that the results of a sleep study were normal. (R. at 548.) McGhee returned to JMH on March 17, 2008, with complaints of leg swelling. (R. at 590-600.) Bilateral lower extremity swelling was noted, with

the right side being slightly worse. (R. at 591.) A chest x-ray and a venous ultrasound study of both legs was normal. (R. at 597-99.) McGhee was diagnosed with edema and was prescribed Lortab and Lasix. (R. at 591-92.) When McGhee saw Dr. Parker on March 27, 2008, he complained of numbness in the right leg down to the knee. (R. at 547.) Dr. Parker refilled McGhee's Methadone and Neurontin. (R. at 547.)

McGhee returned to Hunt for counseling on April 21, 2008. (R. at 482, 688.) At that time, McGhee stated that he was living in an apartment with his daughter and that he got his son on the weekends. (R. at 482, 688.) He noted that he continued to attempt to regain custody of both children. (R. at 482, 688.) Hunt diagnosed moderate, recurrent major depression. (R. at 482, 688.) The same day, McGhee saw Dr. Parker for medication refills, and he complained of increased pain in his right thigh and increased back pain. (R. at 546.) He was diagnosed with lumbosacral exacerbation, and Dr. Parker ordered an MRI and restricted McGhee from lifting more than five pounds. (R. at 546.) On May 16, 2008, McGhee returned to Dr. Parker with complaints of burning in both legs. (R. at 545.) He underwent another MRI of the lumbar spine, which showed a broad-based disc herniation at the L4-L5 level with some crowding of the nerve roots, bilateral foraminal narrowing and ligamentum flavum hypertrophy, same as in the October 2007 study. (R. at 477, 543, 657.) It also showed a fairly focal median to left paramedian disc herniation at the L5-S1 level, a little increased from the previous study, associated with a posterior annular tear and a slight bilateral foraminal intrusion. (R. at 477, 543, 657.)

On June 11, 2008, McGhee continued to complain of insomnia. (R. at 542.) Dr. Parker prescribed Ambien and refilled McGhee's Methadone. (R. at 542.) McGhee

saw Dr. Williams on July 8, 2008, with complaints of back pain. (R. at 480-81, 679-80.) Physical examination was unremarkable, and McGhee was diagnosed with a urinary tract infection and was prescribed medication. (R. at 481, 680.) On July 15, 2008, McGhee saw Hunt with complaints of depression, inability to concentrate and focus, trouble retaining information, insomnia, slow and slurred speech, difficulty breathing, blurred vision and chest pain. (R. at 479, 687.) Hunt noted that McGhee may benefit from further evaluation by a neurologist. (R. at 479, 687.) McGhee's major psychosocial stressors were trying to regain custody of his children and potentially losing his government subsidized apartment and Medicaid benefits. (R. at 479, 687.) Hunt continued to diagnose severe, recurrent, major depression without psychotic features. (R. at 479, 687.) The next day, Hunt completed a mental assessment, finding that McGhee had a good ability to maintain personal appearance, a fair ability to follow work rules, to relate to co-workers, to use judgment, to interact with supervisors, to function independently, to understand, remember and carry out simple job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability and poor or no ability to deal with the public, to deal with work stress, to maintain attention and concentration and to understand, remember and carry out both detailed and complex job instructions. (R. at 230-31.) Hunt referenced McGhee's treatment notes as providing the bases for these findings. (R. at 230-31.)

On August 17, 2008, McGhee returned to JHM with complaints of an abscess under the left arm with pain beginning two to three days previously. (R. at 579-83.) The abscess was incised, drained and packed, and a wound culture was taken, which was positive for MRSA. (R. at 580, 583.) McGhee was prescribed an Epi-pen, Lortab

and Bactrim. (R. at 581.) McGhee saw Meghan Sullivan, a family nurse practitioner at Southwest Virginia Community Health Systems, on August 18, 2008, to have the abscess packing changed. (R. at 576-77, 676-77.) He reported some continued pain under his arm, as well as "nerves." (R. at 576, 676.) He denied depression, but reported many situational stressors at home and financially. (R. at 576, 676.) McGhee further reported panic attacks with shaking and chest pain. (R. at 576, 676.) McGhee was generally pale and chronically ill appearing. (R. at 577, 677.) He was prescribed Clonazepam and Citalopram. (R. at 577, 677.) The following day, and again on August 20, 2008, McGhee returned to have the packing changed. (R. at 572-75, 672-75.)

On August 25, 2008, Dr. Heather B. Pearman, D.P.M., diagnosed hallux valgus deformity[13] on the right greater than the left with painful ambulation. (R. at 668.) She noted the possibility of future surgical repair and prescribed Voltaren. (R. at 668.) The same day, McGhee saw Sullivan for a follow-up, at which time he stated that the Clonazepam and Citalopram were "helping a lot" and that his abscess pain was "greatly improved." (R. at 704-05.)

McGhee presented to JMH on September 14, 2008, with complaints of chest pain and shortness of breath for the previous two to three weeks, cellulitis of the legs, lumbar pain and bilateral leg pain. (R. at 662-63.) He was diagnosed with chest pain and cellulitis of both legs, and he was given morphine, nitroglycerin and Keflex. (R. at 663.) On September 16, 2008, Dr. Parker completed a physical assessment, finding

---

[13]Hallux valgus deformity refers to an angulation of the great toe away from the midline of the body or toward the other toes. *See* Dorland's at 729.

that McGhee could occasionally lift items weighing up to 10 pounds and frequently lift items weighing up to five pounds. (R. at 665-66.) He further found that McGhee needed to change positions and that he could sit for a total of eight hours a day, but for only 10 to 15 minutes without interruption. (R. at 665.) Dr. Parker found that McGhee could occasionally climb, kneel and balance, but he could never crouch and crawl and almost never stoop. (R. at 666.) Dr. Parker found that McGhee's abilities to reach, to handle and to push/pull were affected by his impairments. (R. at 666.) Finally, Dr. Parker found that McGhee had a limited ability to work around moving machinery and vibration. (R. at 666.)

On September 20, 2008, McGhee saw Dr. Juan F. Rodriguez, M.D., with complaints of social phobia, characterized by chest pain, shortness of breath, chest tightness and difficulty speaking in public. (R. at 702.) He was mildly depressed and sad, but with a bright affect with fair insight and judgment. (R. at 702.) Dr. Rodriguez diagnosed moderate, recurrent, major depression and panic disorder without agoraphobia, not otherwise specified, and he assessed McGhee's then-current GAF score at 55. (R. at 702.) McGhee again saw Dr. Rodriguez on November 29, 2008, with continued complaints of depression and panic attacks, which he stated he experienced a few times monthly. (R. at 699, 741.) McGhee further reported difficulty leaving his home. (R. at 699, 741.) He was alert, oriented and cooperative, with no psychomotor agitation or retardation, but was in "some distress." (R. at 699, 741.) McGhee's thought process was coherent, his mood was depressed, but his affect was bright, and he had fair insight and judgment. (R. at 699, 741.) Dr. Rodriguez diagnosed moderate, recurrent, major depression and panic disorder without agoraphobia. (R. at 699, 741.) He assessed McGhee's then-current GAF score at 54.

(R. at 699, 741.)  McGhee returned on January 17, 2009, with complaints of increased panic attacks. (R. at 698, 740.)  Dr. Rodriguez diagnosed panic disorder and moderate recurrent major depression, and he placed McGhee's then-current GAF score at 50.[14] (R. at 698, 740.)  McGhee's dosage of Celexa was increased.  (R. at 698, 740.)

After undergoing a sleep study at Smyth County Community Hospital on February 12, 2009, McGhee was diagnosed with severe obstructive sleep apnea syndrome and severe sleep fragmentation. (R. at 713-14, 716-17.)  In a letter dated February 16, 2009, Dr. Parker opined that McGhee was unable to work due to a dysfunctional back, chronic intractable pain, obstructive sleep apnea, insomnia, obesity and peripheral neuropathy. (R. at 712.)  McGhee underwent another sleep study with continuous positive airway pressure, ("CPAP"), titration on March 6, 2009. (R. at 709-10.) He was diagnosed with severe obstructive sleep apnea, improved with CPAP. (R. at 709.) On April 8, 2009, McGhee complained of poor sleep despite use of a CPAP machine, as well as cognitive impairment, stating that he could not keep up with his appointments. (R. at 739.) Despite continued complaints of depression, he stated that his medications were helping him. (R. at 739.)  He was diagnosed with moderate, recurrent, major depression.  (R. at 739.)  On April 18, 2009, Dr. Rodriguez noted that McGhee had been obtaining benzodiazepines from both him and Dr. Parker.  (R. at 738.)  He was in some distress, but his thought process was coherent, his mood was depressed, his affect was bright, and his insight and judgment were fair. (R. at 738.)  He was diagnosed with panic disorder and moderate recurrent major depression, and his then-current GAF score was assessed at 50.  (R. at 738.) Dr.

---

[14]A GAF score of 41 to 50 indicates "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning. . . ."  DSM-IV at 32.

Rodriguez advised McGhee to find another health care provider due to his "physician shopping." (R. at 738.)

McGhee saw Dr. Anthony E. Holt, D.O., on May 8, 2009, for a neurological examination based on complaints of numbness in both lower extremities, chronic back pain and falling at times. (R. at 729-31.) McGhee reported numbness in both legs and feet for at least the previous six months, but denied any weakness in the lower extremities. (R. at 730.) He had decreased sensation in the right thigh, most likely caused by meralgia paresthetica.[15] (R. at 729, 731.) Strength was full throughout all extremities, and muscle tone was normal in the extremities and the neck. (R. at 731.) Biceps, brachioradialis, triceps and Achilles reflexes were trace, while patellar reflex was 1+. (R. at 731.) Babinski's sign[16] was not present. (R. at 731.) Finger to nose coordination was intact. (R. at 731.) McGhee's gait was mildly wide-based, which Dr. Holt noted could be due to his large body mass index. (R. at 731.) McGhee could not walk on heels and toes, nor could he tandem walk, secondary to back pain. (R. at 731.) Romberg's sign[17] was negative. (R. at 731.) Dr. Holt diagnosed paresthesias,

[15]Meralgia paresthetica is a disease marked by paresthesia, pain and numbness in the outer surface of the thigh, in the region supplied by the lateral femoral cutaneous nerve, due to entrapment of the nerve at the inguinal ligament. *See* Dorland's at 1007.

[16]Babinski's sign indicates the lessening or loss of the Achilles tendon reflex in sciatica. *See* Dorland's at 1520.

[17]Romberg's sign is a swaying of the body or falling when standing with the feet close together and the eyes closed and is observed in tabes dorsalis. *See* Dorland's at 1525. Tabes dorsalis is a slowly progressive degeneration of the posterior columns and posterior roots and ganglia of the spinal cord, occurring 15 to 20 years after an initial infection of syphillis, characterized by lancinating lightning pains, urinary incontinence, ataxia, impaired position and vibratory sense, optic atrophy, hypotonia, hyperreflexia and trophic joint degeneration. *See* Dorland's at 1659.

meralgia paresthetica on the right and pain in the extremities, and he scheduled a nerve conduction study/electromyelogram, ("EMG"), of both lower extremities. (R. at 729.)

McGhee again saw Hunt on May 13, 2009, with continued complaints of back and leg pain, poor memory and an inability to be around people. (R. at 736.) On May 20, 2009, McGhee again reported depression, noting legal stressors. (R. at 735.) His diagnosis remained unchanged. (R. at 735.) Later that day, McGhee underwent an EMG of the lower extremities, and all needle EMG testing was normal, with no findings of spontaneous activity to suggest denervation. (R. at 732-34.)

Hunt completed a mental assessment on May 21, 2009, finding that McGhee had a fair ability to follow work rules, to relate to co-workers, to deal with the public, to interact with supervisors, to maintain personal appearance, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 748-49.) She found that he had a poor or no ability in the remainder of work-related mental activities. (R. at 748-49.) Hunt based these findings on McGhee's poor memory, inability to concentrate or focus attention on tasks and multiple stressors that affected him emotionally. (R. at 748-49.) Dr. Parker affirmed this assessment. (R. at 749.) On June 8, 2009, Dr. Parker opined that McGhee's pain was present to such an extent as to be distracting to the adequate performance of daily activities or work, that physical activity such as walking, standing and bending greatly increased his pain causing abandonment of tasks related to daily activities or work and that medication impacted McGhee's work ability to the extent that it would severely limit his effectiveness in the work place due to distraction, inattention, drowsiness, etc. (R. at 747.)

### III. Analysis

The Commissioner uses a five-step process in evaluating SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2009); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2009).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2009); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings. McGhee argues that the ALJ erred in his mental residual functional capacity finding. (Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 11.) Specifically, McGhee argues that the ALJ erred by accepting the opinions of the state agency psychologists over the opinions of treating sources. (Plaintiff's Brief at 11.) McGhee also argues that the ALJ erred by improperly substituting his opinion for that of highly qualified mental health professionals. (Plaintiff's Brief at 11-13.) McGhee also argues that the ALJ erred by discounting the opinions of Hunt and Dr.

Rodriguez based on his activities of daily living. (Plaintiff's Brief at 11-13.) Additionally, McGhee argues that the ALJ erred by failing to analyze the cumulative effect of all of his impairments in making his disability determination. (Plaintiff's Brief at 13.) Finally, McGhee argues that his claim should be remanded based on new and material evidence from Southwest Virginia Community Health Systems. (Plaintiff's Brief at 13.)

McGhee first argues that the ALJ erred in his mental residual functional capacity finding by accepting the opinions of state agency psychologists Hamilton and Jennings over those of Hunt, his treating counselor, and other mental health care providers at Southwest Virginia Community Health Systems. Particularly, McGhee argues that his treating mental health sources found that he suffered from severe emotional problems that would preclude him from dealing with work stresses and dealing with the public. McGhee further notes that he suffers from frequent panic attacks. I find that the ALJ's mental residual functional capacity finding accommodates McGhee's limited ability to deal with work stresses, in that he limited McGhee to the performance of simple, one- and two-step tasks requiring little independent decisionmaking. The ALJ, however, did not accommodate McGhee's documented limitation on his ability to deal with the public. Even setting aside the opinions of the treating mental health providers, state agency psychologists Hamilton and Jennings, whose opinions the ALJ relied upon in assessing McGhee's mental residual functional capacity, found that McGhee was moderately limited in his ability to interact appropriately with the general public. (R. at 405, 461.) Their mental assessments do not define moderate limitation, and in the written portions of both Hamilton's and Jennings's assessments, they stated that McGhee remained "capable"

of interacting with others. (R. at 406, 462.)  However, it is clear from both Hamilton's and Jennings's assessments that McGhee suffers from some degree of limitation on his ability to deal with the public. It also is clear that this limitation was not incorporated into the ALJ's mental residual functional capacity finding, nor was the vocational expert asked to consider such a limitation. While the vocational expert testified that a hypothetical individual with a poor or no ability to deal with the general public could not perform any work, she was not asked to consider an individual with a moderate restriction on such ability.

I also note that the record on appeal contains evidence of the existence of panic attacks, which appear to have worsened over time. McGhee first complained of panic attacks with shaking and chest pain prior to the ALJ's decision. (R. at 576, 676.) The majority of the evidence of worsening panic attacks is dated subsequent to the ALJ's decision.  However, because the Appeals Council considered this evidence in deciding not to grant review of the ALJ's denial of McGhee's claims, I also must consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins*, 953 F.2d at 96.  Based on the totality of the evidence before the Appeals Council, I find that substantial evidence does not support the ALJ's finding that McGhee did not suffer from a panic disorder.

On September 20, 2008, two days after the ALJ's hearing, McGhee complained to Dr. Rodriguez of panic symptoms, including chest pain, shortness of breath, chest tightness and difficulty speaking in public. (R. at 702.) In addition to moderate, recurrent, major depression, Dr. Rodriguez diagnosed a panic disorder. (R. at 702.) On November 29, 2008, McGhee reported experiencing panic attacks a few times

monthly, as well as difficulty leaving his home. (R. at 699, 741.) Dr. Rodriguez again diagnosed a panic disorder. (R. at 699, 741.) On January 17, 2009, McGhee complained of increased panic attacks, and Dr. Rodriguez again diagnosed a panic disorder. (R. at 698, 740.) McGhee's GAF score decreased to 50 from the previous assessment in November at 54. (R. at 698-99, 740-41.) Dr. Rodriguez increased McGhee's dosage of Celexa. (R. at 698, 740.) In April 2009, Dr. Rodriguez again diagnosed panic disorder and assessed McGhee's GAF score at 50. (R. at 738.) Because the majority of this evidence is dated subsequent to the ALJ's hearing, the vocational expert was not asked about what effect that suffering multiple panic attacks monthly would have on McGhee's ability to work. Contrary to the Appeals Council's finding, I find that such evidence could have changed the ALJ's decision, or at least could have changed the vocational expert's opinion as to what jobs McGhee could perform.

For all of these reasons, I find that substantial evidence does not exist in the record to support the ALJ's mental residual functional capacity finding, and I recommend that the case be remanded to the ALJ for further consideration consistent with this Report and Recommendation. Given this recommended disposition, I find it unnecessary to address the remainder of McGhee's arguments at this time.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.    Substantial evidence does not exist to support the Commissioner's mental residual functional capacity

finding; and

2. Substantial evidence does not exist to support the Commissioner's finding that McGhee was not disabled under the Act and was not entitled to DIB or SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny McGhee's motion for summary judgment, deny the Commissioner's motion for summary judgment, vacate the decision of the Commissioner denying benefits and remand this case to the ALJ for further consideration consistent with this Report and Recommendation.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2009):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and

recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     June 8, 2010.

/s/    *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE